1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA            )
                                    )
        vs.                         )
                                    )         CASE NO.
JAVIER SANCHEZ MENDOZA, JR.,        )    2:21-CR-00034-LGW-BWC
                                    )
_____Defendant._____ )



RULE 11 HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
August 16, 2021 at 1:35 p.m.
Brunswick, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov


For the Defendant:         STEVEN G. BLACKERBY, Esq.
                           Brown, Readdick, Bumgartner,
                             Carter, Strickland & Watkins
                           P. O. Box 220 (31521)
                           5 Glynn Avenue
                           Brunswick, Georgia  31520
                           (912)264-8544
                           Sblackerby@brbcsw.com


Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov



- - -

2

1                    P R O C E E D I N G S

2              (Call to order at 1:33 p.m.)

3          THE COURT:  And let's retrieve Mr. Mendoza.

4          Ms. Sharp, call the next case.

5          THE CLERK:  United States of America versus Javier

6   Sanchez Mendoza, Jr., Tania Groover for the Government, Steven

7   Blackerby for the Defense.

8          MS. GROOVER:  The United States is ready to proceed,

9   Your Honor.

10         MR. BLACKERBY:  Ready for Defense, Your Honor.

11         THE COURT:  Mr. Blackerby, it's my understanding that

12  your client does speak English, but for prior hearings we've had

13  a Spanish language interpreter available in case there needs to

14  be any segment of interpretation rendered; is that correct?

15         MR. BLACKERBY:  That's correct, Your Honor.  Unless he

16  indicates otherwise, I believe he's able to understand what Your

17  Honor is saying in English, but if he has an issue, he's going

18  to tell me and we will discuss with the interpreter if that's

19  okay.

20         THE COURT:  And do you go by Sanchez or Mendoza or

21  Sanchez-Mendoza?

22         THE DEFENDANT:  It's Javier Sanchez Mendoza.  Sanchez is

23  my father's name, and Mendoza is my mother's name.

24         THE COURT:  If someone were to address you formally as

25  "Mister," would they say Mr. Mendoza, Mr. Sanchez, or Mr.

3

1    Sanchez-Mendoza?

2          THE DEFENDANT:  Well, right now, it can be in different

3    county they call me Mendoza so ...

4          THE COURT:  Is that what you prefer?

5          THE DEFENDANT:  Yeah, Mendoza.

6          THE COURT:  And so I have that right, you speak English

7    fluently, but it's not your first language and so you would

8    prefer to have an interpreter available to help you if the need

9    arose?

10          THE DEFENDANT:  Yeah, Your Honor, in case I don't

11    understand a question -- I understand English a lot.  I been in

12    high school here most of my entire life, but I don't understand

13    like if it was --

14          THE COURT:  Right.  Well, Mr. Blackerby and Mr. Mendoza,

15    if you will approach, and Ms. Davis, if you will come forward to

16    receive the oath in case your services are needed at some point.

17    Ms. Sharp, if you will administer it.

18          (Interpreter Julia Davis sworn.)

19          INTERPRETER DAVIS:  Yes, when asked to do so.

20          THE COURT:  Mr. Mendoza, I also notice that you, like

21    me, have hearing issues, and Ms. Sharp has given you earbuds.

22    Can you hear me adequately?

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  I'm going to rely on you to let me know if

25    at any point you can't hear me or if at any point we need to

4

1   call in Ms. Davis to give interpretive service.  If I don't

2   receive notice from you, then I will assume you understand

3   what's being said; okay?

4           THE DEFENDANT:  Yes, ma'am.

5           THE COURT:  All right.  Well, Mr. Mendoza, we're here

6   because the United States Attorney and your own attorney say

7   that you want to plead guilty to this one-count federal felony

8   criminal information that has been filed against you; is that

9   correct?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  The purpose of this proceeding is going to

12  be for me to make sure you understand the case as it's presently

13  pending against you.  I want to make sure you understand all the

14  rights that you waive or give up if I decide to accept your

15  plea.

16          I also want to make sure there's, in fact, a factual

17  basis for a plea of guilty to that one count and that this is

18  really what you want to do after you've discussed it with Mr.

19  Blackerby.

20          There will be other things that we take up as we go

21  along.  I just want you to know right from the beginning this is

22  an important step in your life.  It's not something to take

23  lightly; understand?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  Also know in just a moment I'm going to have

5

1    you put under oath, sworn to tell the truth.  If you don't tell

2    the truth while under oath the Government could prosecute you

3    for perjury; understand?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  Now, Mr. Mendoza, is anybody making you,

6    pushing you, leaning on you to come in here and plead guilty?

7            THE DEFENDANT:  No, ma'am.

8            THE COURT:  This is what you want to do?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  Swear in Mr. Mendoza.

11                         JAVIER SANCHEZ MENDOZA,

12   having been first duly sworn, was examined and testified as

13   follows:

14           THE CLERK:  Thank you.  Please state your full name and

15   spell your last name for the record.

16           THE DEFENDANT:  Javier Sanchez Mendoza, J-a-v-i-e-r,

17   Sanchez, S-a-n-c-h-e-z, middle name, Mendoza, M-e-n-d-o-z-a.

18           THE COURT:  And Mr. Mendoza, do you have a social

19   security number?

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  What are the last four digits?

22           THE DEFENDANT:  It's 3644.

23           THE COURT:  How old are you?

24           THE DEFENDANT:  I'm 24.

25           THE COURT:  Are you married?

6

1        THE DEFENDANT:  No, ma'am.

2        THE COURT:  Do you have any children?

3        THE DEFENDANT:  I got four.

4        THE COURT:  How old are they?

5        THE DEFENDANT:  One is eight, one is seven, one is five

6   and one is one year old.

7        THE COURT:  Where were you born?

8        THE DEFENDANT:  I was born in Mexico.

9        THE COURT:  Which city?

10       THE DEFENDANT:  I came to the United States when I was

11  young so ...

12       THE COURT:  But which city in Mexico were you born in?

13       THE DEFENDANT:  I think it was Mexicali.

14       THE COURT:  Okay.  And where were you living at the time

15  of this arrest?

16       THE DEFENDANT:  In -- before I arrested or my currently

17  ...

18       THE COURT:  Just right before you were arrested, where

19  were you living?

20       THE DEFENDANT:  Well, I been in different places.  I

21  been here working in Georgia in County -- Baxley, Baxley,

22  Georgia.  I been here from when I was little all the way to high

23  school.

24       THE COURT:  Is that what you think of as home now,

25  Baxley?

7

1          THE DEFENDANT:  Yeah, Baxley.

2          THE COURT:  How far did you go in school?

3          THE DEFENDANT:  From preK to high school.

4          THE COURT:  Did you graduate from high school?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  At Appling County High School?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  What year was that?

9          THE DEFENDANT:  It was 2017.

10          THE COURT:  After high school did you continue your

11  education?

12          THE DEFENDANT:  I was but I started working.

13          THE COURT:  So did you do some college?

14          THE DEFENDANT:  I was going to a technical college, but

15  in order to help my family, I started work instead of going to

16  college.

17          THE COURT:  Well, let's cover your work then.  Tell me

18  what jobs you've maintained.

19          THE DEFENDANT:  Most of my entire time I been doing pine

20  straw, pine straw in Baxley with my parents, and that was when I

21  was young, but now since I been grown up, it's all blueberry,

22  blackberry, sweet potato and some other products harvesting.

23          THE COURT:  So you harvest that food product?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  Were you sort of a regular worker or did you

8

1   have any sort of supervisory duties?

2        THE DEFENDANT:  Well, back in time I was a worker, and

3   little by little I learned from experience.  I was working with

4   a big company, like Dole, like Smith Farm, different companies.

5   But now since the company trust me as a supervisor, I moved from

6   labor work, so a supervisor.  At one time they had me to hire a

7   group of people to work in the field, but then again, I have

8   no -- no other people, so I started working with the people, the

9   local people.

10       I actually know the people around Baxley, Alma, Douglas

11  and surrounding, and through there, I started doing a company,

12  opened a company named B&S Harvesting under my name.

13       I registered with the labor department with my social

14  security and we started doing blueberries, me in my own company,

15  harvesting blueberries, tobacco, peanuts.

16       I also do warehouse where I have people working for me,

17  and until now -- until now, before that, I applied for H-2A

18  program with the company because the company, the company that I

19  had then have people with experience.

20       After that, I worked with different company, and I can't

21  remember which was the one company had me packing, me -- hiring

22  me to work for H-2A -- I work for them for picking blueberries

23  and we applied for H-2A program, and then after I decide to get

24  involved in the program one time for me coming in.

25       It's -- I have been with different experience with the

9

1  labor department.  I have studied -- I attend with -- at first

2  it was like they were from Mexico, a lawyer, so he handed me --

3  so from there I be working for myself.

4          THE COURT:  Have you ever been diagnosed with any mental

5  or physical disabilities?

6          THE DEFENDANT:  Yeah, I have been -- when I was little,

7  I have -- I was born with upper cleft, so now I have to wait for

8  surgery, but in it I have problem talking so I have sometime

9  have problem with breathing, too.

10          THE COURT:  So there's an issue with your palate?

11          THE DEFENDANT:  Yes.

12          THE COURT:  A cleft palate?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  And occasionally it causes some breathing

15  difficulties?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  Do you take any medications?

18          THE DEFENDANT:  Right now I'm going to wait for surgery

19  after -- my last surgery was while I was 14 and the last surgery

20  of my -- with my upper cleft so got the hole out of my mouth,

21  and when I turn 25, then I got to go to the dentist and all

22  that.

23          THE COURT:  Well, on a daily basis, do you take any

24  pills or medicine?

25          THE DEFENDANT:  Right now I take some medicine for my

10

1   teeth sometimes it hurt, and I have breathing problems so

2   sometimes I cannot breathe sometimes.  I don't breathe through

3   my nose.  I breathe through my mouth sometimes.  It's hard for

4   me to people understand my words because the air come from my

5   mouth instead of from my nose.

6           THE COURT:  Are you taking any medication presently?

7           THE DEFENDANT:  Not right now, no.

8           THE COURT:  In the last two days have you had any drugs

9   or alcohol?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  All right, Mr. Mendoza, as you stand before

12  me right now, you're presumed innocent, and what that means is

13  the Government is your accuser, and as such, they have to prove

14  that you're guilty and they have got to do that by bringing

15  forth proof of guilt beyond a reasonable doubt.  You as the

16  defendant don't have to prove anything; understand?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Also know that this information that was

19  filed against you, that document that sets forth the charge,

20  that's not evidence.  That's simply what the US Attorney accuses

21  you of having done but it's not evidence; understand?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  Now, Mr. Blackerby, are you appointed or

24  retained in this case?

25          MR. BLACKERBY:  Appointed, Your Honor.

1      THE COURT:  Mr. Mendoza, that means you've explained

2  that you didn't have the kind of money to pay a lawyer to

3  represent you so Mr. Blackerby was appointed to represent you at

4  no charge to you; is that correct?

5      THE DEFENDANT:  Yes, ma'am.

6      THE COURT:  And I do want you to understand you have the

7  right to his representation at no charge to you throughout this

8  and every other phase of your case; understand?

9      THE DEFENDANT:  Yes, ma'am.

10     THE COURT:  Also know you don't have to plead guilty.

11 If you want to persist in a plea of not guilty, you're entitled

12 to do that.  If you were to persist in a plea of not guilty, you

13 would be entitled to a public and speedy trial by jury.

14     During that jury trial a number of rights would belong

15 to you.  The presumption of innocence that we talked about, that

16 would follow you throughout the trial.  Your right to Mr.

17 Blackerby's representation at no charge to you would follow you

18 throughout the trial.  You would have the right to see, hear,

19 confront and cross-examine any witness the Government might

20 call.  You would have the right to see all their evidence.

21     For your own part, you would have the right to put up

22 evidence if you wanted.  You would have the right to call

23 witnesses and use subpoenas from the court to make them appear.

24 You would have the right to take the stand and testify, subject

25 yourself to cross-examination by the US Attorney, but you would

1    also have the right to go to trial and remain silent, and if you

2    elected to do that, nobody could say anything bad about your

3    silence in front of the jury.  It is after all a constitutional

4    right.  Let me stop because I think you indicate you had a

5    question.

6            THE DEFENDANT:  It's not working.

7            THE COURT:  Let's get that fixed right away.  Is that

8    one working?  Mr. Mendoza, can you hear me now?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  You had answered that you understood about

11   your rights and I was reviewing those.  If you decided to

12   persist in a plea of not guilty, you would be entitled to a

13   public and speedy trial by jury, and during that jury trial you

14   would have many rights.  The right that we talked about, the

15   presumption of innocence, would follow you throughout the trial.

16   You would have the right to Mr. Blackerby's services at no

17   charge to you throughout that trial.  You would have the right

18   to see, hear, confront and cross-examine any witness that the

19   Government might call.  You would have the right to see all

20   their evidence.

21           For your own part, you would have the right to put up

22   evidence if you wanted.  You would have the right to call

23   witnesses and use subpoenas from the court to make them appear.

24   You would have the right to take the stand and testify, subject

25   yourself to cross-examination by the US Attorney, but you would

1    also have the right to go to trial and remain silent, and if you

2    elected to do that, nobody could say anything bad about your

3    silence in front of the jury.  It is after all a constitutional

4    right.

5         Do you understand that if you plead guilty and I decide

6    to accept your plea, you will have waived, that is, given up all

7    the rights associated with a trial by jury.  In fact, there will

8    be no trial of any kind; understand?

9         THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  Essentially what will remain of your case

11    will be the sentencing phase; understand?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Do you have any questions about the waiver

14    of those rights?

15         THE DEFENDANT:  No, ma'am.

16         THE COURT:  Well, have you and Mr. Blackerby had the

17    opportunity to talk about the facts and the law as they pertain

18    to your case?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Did he go over with you this information

21    that was filed against you?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Did he cover with you this plea agreement

24    you're proposing?

25         THE DEFENDANT:  Yes, ma'am.

14

1          THE COURT:  Did he talk with you at least in general

2    terms about the federal sentencing guidelines?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Are you satisfied with his representation?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  Do you have any complaints about it

7    whatsoever?

8          THE DEFENDANT:  No, ma'am.

9          THE COURT:  Although I understand that you and Mr.

10   Blackerby have gone over the information together, it's my

11   obligation to cover it with you as a part of this proceeding.

12         As I said, it's a federal felony one-count information

13   that alleges conspiracy to engage in forced labor in violation

14   of 18 USC Section 1594(b).

15         Specifically, the information alleges that beginning at

16   least around August 14th, 2018 continuing up through about

17   November 4th, 2019 in Glynn, Wayne and Pierce counties, all of

18   which are in the Southern District of Georgia, and elsewhere, it

19   alleges that you, Javier Sanchez Mendoza, Jr., knowingly and

20   willfully conspired to commit an offense against the United

21   States, namely, that you did knowingly benefit financially from

22   participation in a venture which has engaged in the provision

23   and obtaining of labor and services by unlawfully charging

24   foreign workers to obtain an H-2A visa and by unlawfully

25   withholding their identification documents by means of abuse and

1   threatened abuse of law and legal process and by means of a

2   scheme, plan and pattern intended to cause foreign workers to

3   believe that, if such foreign workers did not perform the labor

4   and services, that they would suffer serious harm or physical

5   restraint in violation of 18 USC Sections 2 and 1589(b).  It

6   alleges that all that was done in violation of 18 USC Section

7   1594(b) and 18 USC Section 2.

8        Do you understand that's what's charged against you in

9   the information?

10        THE DEFENDANT:  Yes, ma'am.

11        THE COURT:  In order to convict you of that one count,

12   the Government would have to prove beyond a reasonable doubt

13   what are called the essential elements of that offense.  And the

14   essential elements of that particular offense are three-fold.

15        So the Government would have to prove beyond a

16   reasonable doubt first that you conspired with one or more

17   persons to knowingly benefit financially or receive anything of

18   value; second, from the participation in a venture that engaged

19   in providing or obtaining of labor or services of a person; and,

20   finally, that you did that by means of the abuse or threatened

21   abuse of law or legal process or by means of any scheme, plan or

22   pattern intended to cause a person to believe that if that

23   person did not perform such labor or services then that person

24   or another person would suffer serious harm or physical

25   restraint.

1          Do you understand those are the essential elements of

2    that offense?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  And do you understand that by pleading

5    guilty you admit that they are satisfied?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Now, the maximum possible penalty that I

8    could ever impose for a violation of 18 USC Section 1594(b) is

9    imprisonment for any term of years up to life in prison, a fine

10   of not more than $250,000.00, a term of supervised release of

11   not more than five years, a $100.00 mandatory assessment, a

12   second special assessment of $5,000.00, and mandatory

13   restitution to victims if I determine that that is appropriate.

14   Do you understand those are the maximum penalties that I could

15   impose?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  A couple of followup concepts regarding

18   punishment.  That phrase "supervised release" means after any

19   period of federal incarceration, once you're released from

20   prison, you will have to follow the rules that I set forth.

21         Those rules may include but not be limited to a

22   requirement that you get a job, that you not violate any laws.

23   You may be required to pay certain penalties and fines and a

24   restitution amount in accordance with the schedule that The

25   Court sets.

1     You may be required to reveal to any future employers

2  the nature of your conviction.  If you were to fail to live up

3  to the terms of supervised release you could wind up back in

4  prison; understand?

5     THE DEFENDANT:  Yes, ma'am.

6     THE COURT:  Also want you to be familiar with those

7  sentencing guidelines I mentioned.  They are not mandatory --

8  they are advisory -- but it's still my duty to calculate what

9  the advisory guideline range is going to be in your case and to

10  consider that range along with possible departures under the

11  guidelines themselves and then to also consider all the

12  sentencing factors that are set forth in our federal sentencing

13  statute, 18 USC Section 3553.

14     Once I consider all those things, it's going to result

15  in me imposing a punishment on you that's either within that

16  advisory guideline range; it could be below it; it could be

17  above it.

18     Some of the major factors that go into figuring all that

19  out are your criminal history or lack thereof, your role in the

20  offense, what it was you did and whether you came here and told

21  the truth and accepted responsibility for your actions.  Those

22  are some of the major factors that go into it.  There's others.

23  Do you understand all of this?

24     THE DEFENDANT:  Yes, ma'am.

25     THE COURT:  Do you have any questions about any of it?

18

1        THE DEFENDANT:  No, ma'am.

2        THE COURT:  Has anybody promised you an exact sentence?

3        THE DEFENDANT:  No, ma'am.

4        THE COURT:  That's good.  At this point all they can do

5   is give their best estimate and it wouldn't bind me as your

6   sentencing judge; understand?

7        THE DEFENDANT:  Yes, ma'am.

8        THE COURT:  Now, Mr. Mendoza, are you a United States

9   citizen at this point?

10       THE DEFENDANT:  Right now I was under the law of DACA, I

11  think the Dreamer Act, but I was supposed to renew it but I was

12  locked up before, before I got arrested.

13       THE COURT:  What I want you to understand is that a

14  possible implication of your pleading guilty is it could

15  negatively affect your stay here in the United States and

16  subject you to possible deportation; understand?

17       THE DEFENDANT:  Yes, ma'am.

18       THE COURT:  Have you discussed that with your attorney?

19       THE DEFENDANT:  Yes, yes, ma'am.

20       THE COURT:  And I understand that before appearing in

21  front of me this afternoon you appeared before a United States

22  magistrate judge and made a knowing and voluntary waiver of your

23  right to proceed by way of indictment, electing instead to

24  proceed by way of information; is that your understanding, Mr.

25  Blackerby?

19

1          MR. BLACKERBY:  Yes, Your Honor.

2          THE COURT:  And is it yours as well, Mr. Mendoza?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Well, in representing you, let me make sure,

5    has anybody promised you an exact sentence?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  In representing you, Mr. Blackerby has

8    apparently negotiated with the US Attorney's Office trying to

9    reach a plea agreement in your case.  Did he have your

10   permission to do that?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  We will take that agreement up.  Ms.

13   Groover, if you will stand and summarize its provisions.

14         MS. GROOVER:  Thank you, Your Honor.

15         We have reached a plea agreement that calls for the

16   defendant waiving indictment and pleading guilty to Count 1 of

17   the information.  At sentencing the Government will move to

18   dismiss the pending indictment in Criminal Case Number

19   2:20-CR-49.

20         The Government will not object to a recommendation by

21   Probation that Defendant receive a reduction in offense level

22   for acceptance of responsibility pursuant to Section 3E1.1(a) of

23   the sentencing guidelines.

24         Defendant agrees to pay restitution for the full loss

25   caused by his total criminal conduct, which is not limited to

20

1    the specific counts to which he is pleading guilty.  He does

2    agree to provide full, complete, candid and truthful cooperation

3    to the Government and the Government in its sole discretion will

4    decide whether that cooperation qualifies as substantial

5    assistance that warrants the filing of a motion for downward

6    departure or reduction in sentence.

7         The defendant does entirely waive his right to a direct

8    appeal of his conviction and sentence on any ground including

9    any arguments that the statute to which he is pleading guilty is

10   unconstitutional or that the admitted conduct does not fall

11   within the scope of the statute.  There are three exceptions

12   that are outlined in detail in the plea agreement, and they are

13   that the defendant may file a direct appeal only if The Court

14   enters a sentence above the statutory maximum --

15        THE COURT:  I will cover that with him.

16        MS. GROOVER:  Thank you, Your Honor.

17        Defendant also agrees to entirely waive his right to

18   collaterally attack his conviction and sentence on any ground

19   and any method, including but not limited to a Title 28 USC

20   Section 2255, the only exception being that he may collaterally

21   attack his conviction and sentence based on a claim of

22   ineffective assistance of counsel.

23        He does also waive his rights to request information

24   about the investigation and prosecution of his case under the

25   Freedom of Information Act or the Privacy Act, and finally he

21

1  waives the protections of Rule 11 of the Federal Rules of

2  Criminal Procedure and Rule 410 of the Federal Rules of

3  Evidence.

4          That is a summary of the plea agreement we have reached,

5  Your Honor.  The plea agreement document itself is nine pages.

6  On Page 9 bears my signature on behalf of the United States.

7  Would you like me to verify the remaining signatures?

8          THE COURT:  Yes, thank you.

9          MS. GROOVER:  Mr. Blackerby, is that your signature on

10 Page 9?

11         MR. BLACKERBY:  Yes.

12         MS. GROOVER:  Mr. Javier Sanchez Mendoza, is that your

13 signature on Page 9?

14         THE DEFENDANT:  Yes, ma'am.

15         MS. GROOVER:  Your Honor, this is the plea agreement

16 that we've reached that we submit to you for your consideration.

17         THE COURT:  Thank you.

18         Mr. Blackerby, is that summary consistent with the

19 agreement that you negotiated?

20         MR. BLACKERBY:  It is, Your Honor.

21         THE COURT:  And Mr. Mendoza, is that summary consistent

22 with the agreement that you signed?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  Did you read it before you signed it?

25         THE DEFENDANT:  Yes, ma'am.

1      THE COURT:  Other than the provisions contained in that

2   plea agreement, has anybody made you any promises about the

3   outcome of your case?

4      THE DEFENDANT:  No, ma'am.

5      THE COURT:  I do want to pick back up on one point that

6   Ms. Groover made and that is contained in this agreement that

7   you're proposing is a waiver of certain appeal rights.  It

8   states, "Defendant entirely waives his right to a direct appeal

9   of his conviction and sentence on any ground."

10      There are, however, three exceptions to that waiver.

11   That means if but only if one of these three things were to

12   occur would you get a direct appeal right pursuant to this

13   agreement:  Number 1, if I sentence you above the statutory

14   maximum, you could appeal that directly; Number 2, if I sentence

15   you above the advisory guideline range as found by me, you could

16   appeal that directly; or Number 3, if the Government were to

17   file a direct appeal, then you could file one as well.

18   Otherwise, pursuant to this plea agreement, you waive all other

19   direct appeal rights; understand?

20      THE DEFENDANT:  Yes, ma'am.

21      THE COURT:  Any questions about that waiver?

22      THE DEFENDANT:  No, ma'am.

23      THE COURT:  Also contained in the agreement is a waiver

24   of certain collateral attack rights.  It states, "Defendant

25   entirely waives his right to collaterally attack his conviction

1   and sentence on any ground and by any method including but not

2   limited to a 28 USC Section 2255 motion."

3          Now there is one exception to that waiver and that is

4   pursuant to this agreement you retain the right to collaterally

5   attack based on a claim of ineffective assistance of counsel.

6   But, otherwise, this agreement waives all other collateral

7   attack rights; understand?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  Any questions about that waiver?

10         THE DEFENDANT:  No, ma'am.

11         THE COURT:  Well, Mr. Blackerby, as an officer of The

12  Court, are you aware of any impropriety on the part of the

13  Government in handling Mr. Mendoza's case?

14         MR. BLACKERBY:  No, Your Honor.

15         THE COURT:  And Ms. Groover, are you aware of any

16  impropriety on anyone's part in handling this case?

17         MS. GROOVER:  No, Your Honor.

18         THE COURT:  Well, Mr. Mendoza, do you still want to

19  plead guilty to Count 1 of the information?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  Do you want to plead guilty to that count

22  because you are, in fact, guilty of it?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  Do you understand the rights and the

25  privileges that you waive or give up if I accept your plea?

24

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Let the record reflect that Mr. Javier

3    Sanchez Mendoza, Jr. is 34.  He's not married.  He has four

4    children.  He was born in Mexico and was living in Baxley.  He

5    graduated from high school and went on to work primarily in the

6    food-harvesting business.  He does have palate issues and

7    occasionally has taken medication for dental pain that's

8    occasioned by that condition.  He's not taking any medications

9    today.  He's not under the influence of any drugs or alcohol.

10   I've watched him as he's interacted with me and it's clear to

11   see he's in full possession of all his faculties.  He's had the

12   representation of an excellent defense lawyer who has gone over

13   all the important pleadings and concepts with him.  I find that

14   Mr. Mendoza's offer to plead guilty to Count 1 of the

15   information is knowing.  I also find that's voluntary; is that

16   correct, Mr. Mendoza?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Therefore, I will approve of the plea

19   agreement.  Let me call on Ms. Groover for a factual basis and

20   you three may have a seat while she does so.

21          MS. GROOVER:  Thank you, Your Honor.  The United States

22   calls Michael Scott Sapp to the stand.

23             TASK FORCE OFFICER MICHAEL SCOTT SAPP,

24   having been first duly sworn, was examined and testified as

25   follows:

25

1        THE CLERK:  Thank you.  And if you will please state

2   your full name, spell your last, state your occupation and your

3   business address.

4        THE WITNESS:  Michael Scott Sapp, S-a-p-p.  I'm employed

5   by the Brunswick Police Department at 206 Mansfield Street and

6   assigned to the FBI's violent gang task force.

7                          EXAMINATION

8   BY MS. GROOVER:

9   Q.   Are you assigned to assist in the investigation concerning

10  Mr. Mendoza?

11  A.   Yes, ma'am.

12  Q.   And is this case part of a larger investigation into a

13  transnational organization believed to be committing human

14  trafficking, human smuggling and visa fraud that was primarily

15  operating here in the Southern District of Georgia with ties to

16  Mexico and Honduras?

17  A.   Yes, it is.

18  Q.   And since about late November of 2018, has the department

19  of labor, department of state as well as Homeland Security and

20  the FBI been investigating this organization?

21  A.   Yes, ma'am.

22  Q.   For fraudulently using the H-2A visa program to smuggle

23  Mexican and Guatemalan nationals into the United States under

24  the pretext of being an agricultural worker?

25  A.   That's correct.

26

1  Q.    Has the investigation included, among other things, a

2  review of the department of labor certification that must be

3  submitted to bring in foreign workers, as well as a review of

4  immigration documents and authorization documents, as well as a

5  review of the department of state visa admission documents and

6  information received from witnesses and information obtained

7  from multiple search warrants and grand jury testimony?

8  A.    Yes, ma'am.

9  Q.    And has the investigation confirmed that the organization

10 is committing human smuggling and human trafficking and visa

11 fraud and a host of other federal crimes?

12 A.    Yes.

13 Q.    And under the lawful H-2A program, are foreign workers

14 granted a visa for a specific term and are they required to stay

15 at a specific housing location and work at approved farm

16 locations for a specific period of time?

17 A.    Yes, they are.

18 Q.    And are they also required to be paid under the terms of

19 their contract, the petition that brought them in to work?

20 A.    Yes, ma'am.

21 Q.    And after the expiration of the visa, are the foreign

22 workers required to return to their home countries?

23 A.    Yes.

24 Q.    However, did the investigation confirm that this

25 organization is unlawfully charging foreign nationals a fee or a

1  smuggling debt to obtain an H-2A process and come to the United

2  States?

3  A.    They are.

4  Q.    And is that unlawful under the program here in United

5  States?

6  A.    It is.

7  Q.    And once inside the United States, do members of this

8  organization, they do not pay the workers what they are

9  required to under the contract for working in the agricultural

10  field; is that correct?

11  A.    Yes.

12  Q.    And in fact, they move the workers to unapproved housing

13  locations at times?

14  A.    They do.

15  Q.    And do they also move them to unapproved fields to work in

16  different locations that are not approved under their petition

17  and contract?

18  A.    Yes, ma'am.

19  Q.    Did the investigation also reveal that the organization

20  would sometimes charge foreign workers additional fees so they

21  could simply abscond and not work at all?

22  A.    Yes, ma'am.

23  Q.    And would they also hold their identification passport,

24  such as their visa or their passport from their home countries

25  until they paid off their smuggling debt or fee?

1  A.    They would.

2  Q.    And be threatened with deportation until those fees were

3  paid?

4  A.    Yes.

5  Q.    And does the use of H-2A visa program in this unlawful

6  method allow members of this organization to allow workers to

7  come in and receive quasi-US citizenship documents by getting

8  fake driver's license and things like that?

9  A.    Yes.

10  Q.    Fake social security numbers?

11  A.    Sure.

12  Q.    Did the investigation reveal that Mr. Sanchez Mendoza was

13  a part of this organization and that he benefited financially

14  from bringing in workers into the United States?

15  A.    Yes, he did.

16  Q.    And specifically by unlawfully charging the workers a fee

17  and holding onto their documentation until that fee was paid?

18  A.    Yes, ma'am.

19  Q.    Did Mr. Mendoza operate out of Glynn County, Wayne County

20  and Pierce County primarily?

21  A.    Yes.

22  Q.    Here in the Southern District of Georgia?

23  A.    Yes, ma'am.

24  Q.    And his role in the organization, was he more of a crew

25  leader or supervisor of the workers once they were inside the

1   United States?

2   A.    He was.

3   Q.    And so he would help ensure that workers were staying at

4   locations and working at locations that the organization wanted

5   them to; is that correct?

6   A.    That's correct.

7   Q.    Would he also receive money from the workers?

8   A.    Yes.

9   Q.    On November the 4th of 2019, did the FBI in Brunswick, did

10  you assist in locating a witness identified as Jane Doe in this

11  investigation, Jane Doe Number 1?

12  A.    I did.

13  Q.    And was it reported that she was kidnapped by -- at

14  knifepoint by an individual in a white truck when she was

15  outside?

16  A.    Yes, ma'am.

17  Q.    And so based on that 911 report, FBI got involved to help

18  locate that individual; is that correct?

19  A.    Yes.

20  Q.    Did the FBI eventually locate her inside the home of Mr.

21  Mendoza and she was crying and visibly upset?

22  A.    We did.

23  Q.    And did law enforcement speak with Jane Doe Number 1 and

24  she explained that she had worked for Mr. Mendoza and she was

25  trying to escape; is that correct?

1  A.    Yes, ma'am.

2  Q.    And that she was required to work in the fields along with

3  other workers?

4  A.    Correct.

5  Q.    Did she explain, too, Mr. Mendoza brings in workers from

6  Mexico and charges them a fee to come to America and work?

7  A.    Yes.

8  Q.    And did she also explain that Mr. Mendoza typically

9  charges workers approximately $1200.00 for the privilege of

10  coming to America but he charged her less in this particular

11  case?

12  A.    Yes, ma'am.

13  Q.    And did she explain that the workers did not stay at their

14  housing locations where they were supposed to under the

15  paperwork under Mr. Mendoza?

16  A.    She did.

17  Q.    Did agents throughout the investigation interview other

18  witnesses who also testified before the grand jury who explained

19  Mr. Mendoza's role in this case?

20  A.    Yes, ma'am.

21  Q.    Did they also charge the workers and supervise them in the

22  fields?

23  A.    Yes, they did.

24  Q.    And did agents review the petitions and the documents that

25  were submitted in this case to bring over foreign workers that

31

1    worked for Mr. Mendoza under the H-2A program?

2    A.    Yes.

3    Q.    Including Jane Doe Number 1?

4    A.    Yes.

5    Q.    And according to the paperwork, was Jane Doe Number 1, was

6    her paperwork submitted on or about August the 14th of 2018?

7    A.    Yes, ma'am.

8    Q.    And she then remained here within the Southern District of

9    Georgia in the various counties of Glynn, Wayne and Pierce

10   County until law enforcement located her on November the 4th of

11   2019?

12   A.    That's correct.

13        MS. GROOVER:  Thank you.  Those are all the questions.

14        THE COURT:  Mr. Blackerby, any questions for the task

15   force officer?

16        MR. BLACKERBY:  No questions, Your Honor.

17        THE COURT:  You may step down.  Thank you.

18        Mr. Blackerby, Mr. Mendoza and Ms. Davis, reapproach.

19   Mr. Mendoza, do you disagree with any of the testimony given by

20   the task force officer in your case this afternoon?

21        THE DEFENDANT:  No.

22        THE COURT:  Do you admit the truth of his testimony?

23        THE DEFENDANT:  Yes.  Yes, ma'am.

24        THE COURT:  Based on the record made at this proceeding,

25   I'm satisfied there's a factual basis for a plea of guilty to

32

1    Count 1 of the information.

2         Ms. Sharp, has that been entered?

3         THE CLERK:  I believe Mr. Blackerby has the change-of-

4    plea form and, Your Honor, the plea of guilty has been entered.

5         THE COURT:  And Mr. Mendoza, did you sign that plea of

6    guilty?

7         THE DEFENDANT:  Yes, ma'am.

8         THE COURT:  And Mr. Blackerby, did he do so in your

9    presence?

10        MR. BLACKERBY:  Yes, Your Honor.

11        THE COURT:  The plea of guilty is accepted and I now

12   adjudge you guilty of Count 1 of the information.  The probation

13   officer will conduct a presentence investigation.  She will

14   issue a report and disclose that report to the Defense and to

15   the Government and will thereafter schedule your sentencing

16   hearing.

17        Mr. Mendoza, we will remand you to the custody of US

18   Marshal.

19        Mr. Blackerby?

20        MR. BLACKERBY:  One brief question, Your Honor.  Mr.

21   Mendoza was originally being housed in Coffee County.  He

22   recently got transferred here to Glynn about two to three weeks

23   ago.  He has expressed to me some safety concerns that have

24   arisen since he got moved here to Glynn and has asked me to ask

25   whether it might be possible for him to go back to Coffee County

33

1    for safety reasons?

2          THE COURT:   And I will direct the US Marshal to make

3    that inquiry.   I have no objection to him being moved back to

4    Coffee if there's not a security or resource issue about it, so,

5    Marshal, if you will check on that for us.

6          With that, I will remand you, and Ms. Davis, Mr.

7    Blackerby and Ms. Groover, you may be excused, and we will be in

8    recess.

9          (Proceeding concluded at 2:17 p.m.)

10                        CERTIFICATION

11

12          I certify that the foregoing is a true and correct

13   transcript of the stenographic record of the above-mentioned

14   matter.

15

16

18   _____        07/20/2022

19   Debra Gilbert, Court Reporter          Date

20

21

22

23

24

25